Citation Nr: 1536756 
Decision Date: 08/27/15 Archive Date: 09/04/15

DOCKET NO. 07-26 859 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Portland, Oregon


THE ISSUES

1. Entitlement to a disability rating greater than 10 percent for residual scars, status-post appendectomy.

2. Entitlement to service connection for erectile dysfunction to include as secondary to service-connected disabilities.

3. Entitlement to a total disability evaluation based on individual unemployability due to service-connected disabilities (TDIU) for the period prior to April 23, 2012.


REPRESENTATION

Appellant represented by: Daniel G. Krasnegor, Esq.


ATTORNEY FOR THE BOARD

K. Hubers, Associate Counsel


INTRODUCTION

The Veteran served on active duty from November 1966 to October 1968. 

This matter comes before the Board of Veterans' Appeals (BVA or Board) on appeal from a May 2005 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in San Diego, California with respect to the service connection and increased rating claim and a January 2014 rating decision of the VA RO in Portland, Oregon which granted entitlement to TDIU effective April 23, 2012. The RO in Portland, Oregon currently has jurisdiction over this entire matter.

In August 2009, the Board issued a decision which, in part, continued a 10 percent disability rating for residual scars, status-post appendectomy with adhesions; assigned a separate 10 percent disability rating based on adhesions of the peritoneum; and denied service connection for IBS, GERD, and erectile dysfunction. The Veteran appealed that decision to the United States Court of Appeals for Veterans Claims (CAVC or Court). In July 2010, the Court granted a Joint Motion for Partial Remand (JMR), vacating and remanding these issues to the Board.

In April 2011, pursuant to the terms of the Court's Order (and JMR), the Board remanded those claims to the Appeals Management Center (AMC), in Washington, DC, for further development and readjudication. The Board finds that the AMC completed the requested development with respect to the claim of entitlement to an increased rating for scars and readjudicated the claim in a December 2013 Supplemental Statement of the Case (SSOC). Therefore, that issue is properly before the Board on its merits. See Stegall v. West, 11 Vet. App. 268 (1998). However, the development conducted with respect to the claim of entitlement to service connection for erectile dysfunction was insufficient, therefore the matter must be remanded to ensure full compliance with the Board's prior remand instructions. Id.

Subsequent to the Board's April 2011 remand, the RO granted service connection for IBS and GERD, combined those conditions with the abdominal adhesions for purposes of assigning a disability rating, and assigned a 60 percent rating for the residuals of appendectomy with adhesions, IBS, GERD, and other related conditions. 

In addition, the Veteran's claim of entitlement to TDIU (which is a part of all increased rating claims where raised by the record) was granted in a January 2014 rating decision by the RO effective April 23, 2012, and the Veteran perfected an appeal with respect to entitlement to TDIU prior to the effective date of the grant.

The Veteran has limited his appeal to the three issues listed above. See December 2014 Correspondence from Representative (indicating that only the three issues listed above are still on appeal); February 2015 E-mail from Representative (confirming intent to limit appeal to the above three claims); see also July 2015 Written Brief Presentation (listing three issues). Therefore, those three issues are the only issues currently before the Board.

The issue of entitlement to service connection for erectile dysfunction is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran has three abdominal scars, one painful and all stable, resulting from in-service abdominal surgery; the total combined area is 36 square centimeters.

2. Prior to April 23, 2012, the Veteran's service-connected disabilities did not prevent him from securing or following a substantially gainful occupation.





CONCLUSIONS OF LAW

1. The criteria for a rating in excess of 10 percent for abdominal scars have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.118, Diagnostic Codes 7800-7805 (2015); 38 C.F.R. § 4.118, Diagnostic Codes 7800-7805 (2008).

2. The criteria for the assignment of TDIU due to service-connected disabilities have not been met. 38 U.S.C.A. §§ 1155, 5107, 5110 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.25 (2015).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Assist and Notify

When VA receives a complete or substantially complete application for benefits, it must notify the claimant of the information and evidence not of record that is necessary to substantiate a claim, which information and evidence VA will obtain, and which information and evidence the claimant is expected to provide. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a). See also Quartuccio v. Principi, 16 Vet. App. 183 (2002); Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

The RO sent multiple letters, including in 2003, 2004, 2008 (2), 2009 (2), 2010 (2), and 2013, to the Veteran advising him of the elements of his claims, the assistance VA would provide, and the assignment of ratings and effective dates. As the contents of the notice letters fully comply with the requirements of 38 U.S.C.A. § 5103 and 38 C.F.R. § 3.159, the Board concludes that VA satisfied its duties to notify the Veteran.

VA's duty to assist includes assisting the claimant in the procurement of service and other relevant records. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. The RO associated the Veteran's service treatment records, Social Security Administration (SSA) records, and VA treatment records with the claims file. The Veteran has not identified any records aside from those that are already associated with the claims file. Thus, the Board concludes that VA has made every reasonable effort to obtain all records relevant to the Veteran's claim.

VA also satisfied its duty to obtain a medical examination. In April 2009, December 2010, June 2011, July 2012, April 2012, April 2013, and November 2013, VA provided the Veteran medical examinations or obtained medical opinions relevant to the issues on appeal. The examinations and opinions, collectively, are adequate as the VA examiners reviewed the Veteran's pertinent medical history, conducted a clinical evaluation of the Veteran, and provided an adequate discussion of relevant symptomatology. See Stefl v. Nicholson, 21 Vet. App. 120, 123-24 (2007); Barr v. Nicholson, 21 Vet. App. 303, 311-12 (2007). The examinations and medical evidence also discuss the functional limitations caused by each of the Veteran's service-connected disabilities during the relevant time period.

The Veteran's representative argues that "whether the combined effects of the veteran's service-connected conditions would have prevented employment...is a medical determination." While it is necessary to have sufficient medical evidence to make that determination, the question of whether symptoms render a Veteran unemployable is a legal question for adjudicators, rather than a medical question for health care professionals. See Moore v. Nicholson, 21 Vet.App. 211, 218 (2007) ("The medical examiner provides a disability evaluation and the rating specialist interprets medical reports in order to match the rating with the disability.") rev'd on other grounds sub nom. Moore v. Shinseki, 555 F.3d 1369 (Fed. Cir. 2009). The Board finds that the medical evidence currently of record is sufficient to make that legal determination in this case. Geib v. Shinseki, 733 F.3d 1350, 1353-54 (Fed. Cir. 2013) (holding that, in a TDIU determination, "VA's duty to assist does not require obtaining a single medical opinion regarding the combined impact of all service-connected disabilities."); see also Smith v. Shinseki, 647 F.3d 1380, 1385-86 (Fed. Cir. 2011) (VA is not required to obtain an industrial survey from a vocational expert before making a TDIU determination but may choose to do so in an appropriate case). The Board finds the medical evidence adequate to determine the merits of the Veteran's claim of entitlement to TDIU for the period prior to April 23, 2012. No further examinations or opinions are necessary.

In light of the foregoing, the Board is satisfied that all relevant facts have been adequately developed to the extent possible; no further assistance to the appellant in developing the facts pertinent to his claim currently on appeal is required to comply with the duty to assist. 38 U.S.C.A. §§ 5103 and 5103A; 38 C.F.R. § 3.159.

II. General Principles

Under 38 U.S.C.A. § 7104, Board decisions must be based on the entire record, with consideration of all the evidence. The law requires only that the Board address its reasons for rejecting evidence favorable to the claimant. Timberlake v. Gober, 14 Vet. App. 122, 128-29 (2000). The Board must review the entire record, but does not have to discuss each piece of evidence. Gonzales v. West, 218 F.3d 1378, 1381 (Fed. Cir. 2000).

In deciding the Veteran's claim, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the Veteran prevailing in either event; or whether a preponderance of the evidence is against the claim, in which case the claim is denied. 38 U.S.C.A. § 5107; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination, the benefit of the doubt is afforded the claimant.

In determining whether statements submitted by a veteran are credible, the Board may consider internal consistency, facial plausibility, and consistency with other evidence submitted on behalf of the claimant. Caluza v. Brown, 7 Vet. App. 498 (1995).

III. Increased Rating: Scars

The Veteran seeks an evaluation in excess of 10 percent disabling for his service-connected residual scars, status post appendectomy. The Veteran, through his representative, argues that his scars are painful, so a 20 percent rating is warranted under Diagnostic Code 7804 for "three or four scars that are unstable or painful." See July 2015 Written Brief Presentation.

As an initial matter, the Board acknowledges that the Veteran contends that his service-connected scars warrant a higher evaluation and has carefully reviewed all the evidence, including his and others' lay statements regarding his symptoms. However, in determining the actual degree of disability, medical records and an objective examination by a medical professional are more probative of the degree of the Veteran's impairment. See Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed.Cir. 2009); King v. Shinseki, 700 F.3d 1339, 1344-45 (Fed. Cir. 2012). The Board finds that the medical opinions of this lay Veteran are not competent evidence of the clinical significance of his subjectively observed symptoms. Id. Similarly, the Board is also incompetent to evaluate the clinical significance of the reported symptoms, in contrast to applying the rating criteria in light of the competent medical evidence. See Colvin v. Derwinski, 1 Vet.App. 171, 174 (1991) (Board may not make independent medical assessments); see also Kahana v. Shinseki, 24 Vet. App. 428, 438 (2011) (Lance, J., concurring) ("The question of whether a particular medical issue is beyond the competence of a layperson-including both claimants and Board members-must be determined on a case-by-case basis."). Therefore, in determining the appropriate rating, the legal criteria will be applied to the facts as revealed by the medical evidence of record.

Disability evaluations are determined by comparing a Veteran's present symptomatology with criteria set forth in the VA's Schedule for Rating Disabilities (Rating Schedule), which is based on average impairment in earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. When a question arises as to which of two ratings apply under a particular diagnostic code, the higher evaluation is assigned if the disability more closely approximates the criteria for the higher rating. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. 38 C.F.R. § 4.3. The Veteran's entire history is reviewed when making disability evaluations. See generally, 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589, 594 (1991).

Where, as in the present case, entitlement to compensation has already been established and increase in disability rating is at issue, present level of disability is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). Therefore, although the Board has thoroughly reviewed all evidence of record, the more critical evidence consists of the evidence generated since the most recent rating decision. Further, the Board must evaluate the medical evidence of record since the filing of the claim for increased rating and consider the appropriateness of a "staged rating" (i.e., assignment of different ratings for distinct periods of time, based on the facts). See Hart v. Mansfield, 21 Vet. App. 505 (2007).

The evaluation of the same disability under various diagnoses is to be avoided. 38 C.F.R. § 4.14. While the assignment of separate evaluations for separate and distinct symptomatology is not precluded, it is only permitted where none of the symptomatology justifying an evaluation under one diagnostic code is duplicative of or overlapping with the symptomatology justifying an evaluation under another diagnostic code. Esteban v. Brown, 6 Vet. App. 259, 262 (1994); see also VA Gen. Coun. Prec. 9-2004 (Sep. 17, 2004) ("[T]he key consideration in determining whether rating under more than one diagnostic code is in order is whether the ratings under different diagnostic codes would be based on the same manifestation of disability or whether none of the symptomatology upon which the separate ratings would be based is duplicative or overlapping.").

The Veteran's scars were service-connected and rated under a previous version of 38 C.F.R. § 4.118. The regulations pertaining to rating scar disabilities have been amended during the pendency of the Veteran's appeal. Therefore, the Veteran's scars will be evaluated under both the old and new versions and the highest available rating will be assigned. See 73 Fed.Reg. 54708-01 (Sept. 23, 2008) (providing that already service-connected and rated scar disabilities should be evaluated under both the old and new regulations for the period beginning October 23, 2008, if requested by the Veteran). The Veteran has argued that the current version of the regulations warrant a higher evaluation for his service-connected scars. Because he can only benefit from evaluation under both versions, the Board interprets his argument as a request to apply the new regulations if doing so will result in a more favorable rating.

The Veteran's service-connected residual scars, status-post appendectomy with adhesions are currently evaluated as 10 percent disabling under 38 C.F.R. § 4.118, DC 7804 (2008).

Under the prior, 2008 version of the Schedule for Rating Disabilities, scars were rated under DCs 7800 to 7805. 

Diagnostic Code 7800 required involvement of the head, face, or neck.

Diagnostic Code 7801 governed scars, other than the head, face, or neck, that were deep or cause limited motion, a 10 percent evaluation was assignable when the area or areas exceeded six square inches (39 square centimeters). A 20 percent evaluation was assignable when the area or areas exceed 12 square inches (77 square centimeters). 

Diagnostic Code 7802 governed scars other than the head, face, or neck, that were superficial and did not cause limited motion. A 10 percent evaluation was assignable for area or areas of 144 square inches (929 square centimeters) or greater.

Diagnostic Code 7803 provided for a 10 percent evaluation for scars that are superficial and unstable. An unstable scar is one where, for any reason, there is frequent loss of covering of skin over the scar. 38 C.F.R. § 4.118, DC 7803, Note (1). A superficial scar is one not associated with underlying soft tissue damage. 38 C.F.R. § 4.118, DC 7803, Note (2).

Under Diagnostic Code 7804, a 10 percent evaluation was assignable for scars that were superficial and painful on examination.

Under Diagnostic Code 7805, other types of scars were rated based on limitation of function of affected part.

Effective October 23, 2008, scars are evaluated under 38 C.F.R. § 4.118, DC 7800-7805 (2015).

Diagnostic Code 7800 requires involvement of the head, face, or neck. 

Diagnostic Code 7801 applies to scars, other than head, face, or neck, that are deep and nonlinear and provides for a 10 percent rating where the scars have an area of at least 6 square inches (39 sq. cm.) but less than 12 square inches (77 sq. cm.).

Diagnostic Code 7802 provides for no more than a 10 percent rating and requires involvement of an area or areas of 144 square inches (929 sq. cm.).

The Rating Schedule no longer includes a Diagnostic Code 7803.

Diagnostic Code 7804 applies to scars that are unstable or painful. A 10 percent rating is warranted for one or two scars that are unstable or painful. A 20 percent rating is warranted for three or four such scars. A 30 percent rating is warranted for five or more scars that are unstable or painful. Note (1) provides that an unstable scar is one where, for any reason, there is frequent loss of covering of skin over the scar.

Diagnostic Code 7805 applies to limitation of function of the affected part and specifically provides: "Evaluate any disabling effect(s) not considered in rating provided under diagnostic codes 7800-04 under an appropriate diagnostic code." Id.

Analysis

The Veteran's scars do not affect his head, face, or neck, so both the prior and current versions of DC 7800 are inapplicable. The medical evidence is against finding that a compensable rating is warranted under the old or new version of either DC 7801 or 7802. The scars do not meet the criteria under either of those diagnostic codes. See, e.g., November 2013 VA Examination (finding that none of the scars were unstable or due to burns, that they affect only the anterior trunk, and have an approximate total area of 36 square centimeters).

Former DC 7803 provides for a 10 percent rating for scars that are superficial and unstable. While the scars at issue here are superficial, they are not unstable. See November 2013 VA Examination. The Veteran has not contended otherwise. A rating under the 2008 version of DC 7803 is not warranted.

With respect to Diagnostic Code 7804, the former version is ambiguous regarding whether the indicated 10 percent rating applies to a group of service-connected scars that are superficial and painful, or to each scar that is both superficial and painful. Compare 38 C.F.R. § 4.118, DC 7804 (2008) ("Scars, superficial, unstable..." with 38 C.F.R. § 4.118, DC 7804 (2015) (specifying that a 10 percent rating is warranted for "one or two scars" and a 20 percent rating is warranted for "three or four such scars"). The Board will assume, without deciding, that the prior version allows a 10 percent rating for each superficial, painful scar. However, the Board finds that only one of the scars at issue is painful, so a 10 percent rating, but no higher, is warranted for the three abdominal scars under either the old or the new version of DC 7804.

There is ambiguity in the evidence regarding the number of scars and associated symptoms. The RO requested a medical opinion to resolve those ambiguities. In April 2013, a VA examiner provided an addendum opinion discussing and reconciling the apparent inconsistencies in the examinations from May 2003, March 2005, June 2011, and July 2012. The examiner states that the July 2012 VA examiner's opinion is correct that "the veteran has 3 scars on his abdomen." The scarring creates "minimal" limitations in functioning consisting primarily of pain when "stretching the abdominal wall in the supine position." See April 2013 VA Examiner's Addendum Opinion.

Although the Veteran contends that the pain is associated with all three scars (warranting a 20 percent rating), he relies on general language in the April 2013 examiner's addendum opinion that relates pain and some limitation of motion to the three abdominal scars. This, however, ignores the medical evidence indicating that the pain on stretching is due to the scar in the right lower quadrant and the (separately rated) internal adhesions. See, e.g., November 2013 VA Examination (identifying three scars on the Veteran's trunk, one of which was painful); April 2013 VA Examiner's Addendum Opinion (noting "minimal" limitation associated with scarring); July 2012 VA Examination (attributing abdominal pain and associated limitations to internal adhesions which cause diffuse tenderness "in all quadrants"); June 2011 VA Examination (discussing two scars and noting only the scar on the right lower quadrant of the abdomen was painful); March 2005 VA Examination (discussing only two scars, but finding that "right upper quadrant scar causes...no symptoms whatever" while "the one on the right lower quadrant of the abdomen is undoubtedly associated with some adhesions" that cause the abdominal pain); May 2003 VA Examination (noting "mild tenderness and mild numbness" of the right lower quadrant scar, but only "slight" tenderness and numbness due to the other two scars). In summary, the medical evidence directly addressing pain associated with each scar indicates only one scar is painful and the more general evidence of "minimal" limitation of motion and generalized abdominal pain fail to distinguish between the three scars at issue and the internal adhesions. See November 2013 VA Examination (explaining that the painful scar "interferes with position and is mildly tender to palpation").

The Board must interpret the VA examination reports and reconcile the medical evidence. Acevedo v. Shinseki, 25 Vet. App. 286, 294 (2012) (medical reports must be read as a whole and in the context of the evidence of record); Buczynski v. Shinseki, 24 Vet.App. 221, 226 (2011) (noting duty of rating specialist to interpret examination reports). In doing so, the Board finds that one of the three abdominal scars (specifically, the one in the right lower quadrant) is painful and that the more generalized pain with associated limitation of back extension is due to that scar and to the separately rated internal adhesions. Therefore, there is only one painful scar. No rating higher than 10 percent under current DC 7804 is warranted. Similarly, the Veteran was entitled to only one 10 percent rating under the prior version of DC 7804. Assuming the scars could be rated separately, the two scars that are not painful would not meet the criteria for a compensable rating under DC 7804.

With respect to DC 7805 (allowing ratings under other diagnostic codes for functional limitations due to scars), no separate rating for limitation of motion is warranted on the medical evidence of record. While there is some indication of "minimal" limitations of motion of the thoracolumbar spine (e.g. stretching in a supine position), the limitations do not meet the criteria for any rating under the General Rating Formula for Diseases and Injuries of the Spine. See 38 C.F.R. § 4.71a, DCs 5235 to 5243 (providing for a 10 percent rating where forward flexion of the thoracolumbar spine is limited to 60 degrees or less or combined range of motion of the thoracolumbar spine is 235 degrees or less); May 2003 VA Examination (indicating back extension is limited, during flare-ups, to 10 degrees due to abdominal symptoms, but attributing remaining back symptoms, including limited flexion, to other conditions); April 2013 VA Examiner's Addendum Opinion (noting "minimal" limitation associated with scarring). 
 
The Board also notes that the 60 percent rating assigned for the abdominal adhesions and related medical conditions (IBS, GERD, etc.) is based, in part, on abdominal pain and tenderness related to the adhesions of peritoneum. See August 2011 Rating Decision; January 2014 Rating Decision. At least a portion of the abdominal pain that causes functional limitations is related to the abdominal adhesions. In making this finding, the Board relies, in significant part, on the July 2012 opinion letter by a VA nurse practitioner (the Veteran's primary care provider) documenting the Veteran's three abdominal scars, the pain when stretching the abdominal wall, and diffuse tenderness of the abdomen. She attributed the abdominal pain to internal adhesions from the in-service surgery. 

The Board finds that awarding a higher or additional rating for the abdominal pain, including the pain on stretching or the diffuse tenderness, or for the associated functional limitations, would constitute impermissible pyramiding. Currently, the Veteran has a 10 percent rating for the external scars based on one of the scars being painful and he has a 60 percent rating partly based on other related abdominal pain. The Board finds that the disabling effects that resulted in these ratings are sufficiently distinct to avoid the prohibition on pyramiding, but that a third rating (or a higher rating for the scars) based on the minimal functional impact of the abdominal pain on stretching is not appropriate. 38 C.F.R. § 4.14; Esteban, 6 Vet. App. at 262; see also VA Gen. Coun. Prec. 9-2004 (Sep. 17, 2004).

These considerations apply with equal force when considering either the former or the current Rating Schedule. While each scar could be rated separately under the old version, the two scars that are not painful cause no disabling effects. As discussed above, any such limitations are due to the single painful scar and to the separately rated internal adhesions (and associated conditions), so no separate, compensable rating is warranted under the old version. Likewise, the Board will not assign separate ratings under the current version of DC 7804 to the two scars that are not painful because of the pyramiding concerns discussed at length above.

The weight of the evidence supports finding that the Veteran has three scars only one of which is painful and that his symptoms most closely approximate the 10 percent criteria for the entire period on appeal under either the old or new versions of the Rating Schedule pertaining to scars. 38 C.F.R. § 4.118, DC 7804 (2015); 38 C.F.R. § 4.118, DC 7804 (2008) see also Gilbert, 1 Vet. App. at 53-56. Therefore, entitlement to an evaluation in excess of 10 percent for the Veteran's service-connected residual scars, status-post appendectomy, is denied.

Additional Considerations

Consideration of referral for an extraschedular rating requires a three-step inquiry. See Thun v. Peake, 22 Vet. App. 111 (2008), aff'd sub nom. Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009). The first question is whether the schedular rating criteria adequately contemplate the Veteran's disability picture. Thun, 22 Vet. App. at 115. If the criteria reasonably describe the Veteran's disability level and symptomatology, then the Veteran's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. If the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology and is found inadequate, then the second inquiry is whether the Veteran's exceptional disability picture exhibits other related factors such as those provided by the regulation as governing norms. If the Veteran's disability picture meets the second inquiry, then the third step is to refer the case to the Under Secretary for Benefits or the Director of Compensation Service to determine whether an extraschedular rating is warranted. 

The evidence of this case does not show an exceptional disability picture that the available schedular evaluation for the service-connected disability is inadequate. Thun v. Peake, 22 Vet. App. 111, 118-19 (2008). A comparison of the level of severity and symptomatology of the Veteran's disability with the established criteria found in the rating schedule for that disability shows that the rating criteria reasonably describes the Veteran's disability level and symptomatology. 

The diagnostic codes considered and applied above provide specific criteria encompassing the symptoms that the Veteran attributes to his scars (i.e. pain and some limitation of motion). The schedular rating was assigned for one painful scar which is explicitly contemplated by DC 7804. Moreover, a separate rating for limitation of motion was not assigned both because any such limitations did not meet or more nearly approximate the criteria for a compensable rating based on limitation of extension of the back and because the currently assigned ratings (both for the scars and for the internal adhesions) encompassed the pain which causes the functional limitations. An extraschedular rating based on symptoms already considered in assigning the current disability ratings would not be appropriate on the evidence currently of record. See 38 C.F.R. § 4.14. In any case, the criteria for the currently assigned schedular ratings reasonably describe the Veteran's disability level and symptomatology.

The Board finds that the rating schedule is adequate, even in regard to the collective and combined effect of all of the Veteran's service connected disabilities, and that referral for extraschedular consideration is not warranted under the circumstances of this case. Johnson v. McDonald, 762 F.3d 1362, 1365-66 (Fed. Cir. 2014). The evidence does not indicate that the Veteran's service-connected posttraumatic stress disorder (PTSD) (30% until 4/2012, 70% thereafter), loss of bladder control (20% until 11/2013, 40% thereafter), residuals from appendectomy (including adhesions, abdominal pain, IBS, GERD, etc.) (60% during the appeal period), scars (10%) and tinnitus (10%) have a collective or combined effect that warrants extraschedular consideration. Rather, the criteria in the rating schedule applicable to each of the non-abdominal disabilities adequately describes the disability level for those conditions. Furthermore, the functional impairments of the Veteran's service-connected disabilities (particularly those affecting the abdomen) overlap to a significant extent and are adequately compensated with the currently assigned schedular ratings (70% until November 2009, 80% until April 2012, 90% until November 2013, and 100% thereafter; also TDIU from April 2012 through November 2013). Notably, the schedular rating for the residuals from appendectomy (adhesions, abdominal pain, IBS, GERD, etc.) is based in significant part on "considerable impairment of health" due to the combined effect of those interrelated conditions. See January 2014 Rating Decision. The Board finds that this schedular rating (in addition to the schedular rating for scars) adequately accounts for the Veteran's abdominal symptoms and associated functional limitations.

Consideration of whether the Veteran's disability picture exhibits other related factors such as those provided by the regulations as "governing norms" is not required and referral for consideration of an extraschedular rating for his service-connected scars is not warranted. 38 C.F.R. § 3.321(b)(1); Thun, 22 Vet. App. at 118-19.

IV. TDIU

The Veteran seeks entitlement to TDIU based on his service-connected disabilities. See, e.g., December 2013 VA Form 21-8940. The Veteran had a TDIU rating from April 23, 2012, to November 5, 2013. He has been rated 100 percent disabled since November 5, 2013. His claim is of entitlement to TDIU prior to April 23, 2012, and covers the period beginning July 29, 2004 (the date of his claim for increased ratings that resulted in this appeal).

VA will grant TDIU when the evidence shows that the Veteran is precluded, by reason of his service-connected disabilities, from obtaining and maintaining any form of gainful employment consistent with his education and occupational experience. 38 C.F.R. §§ 3.340, 3.341, 4.16.

Under the applicable regulations, TDIU may be granted only when it is established that the service-connected disabilities are so severe, standing alone, as to prevent the obtaining and maintaining of substantially gainful employment. Under 38 C.F.R. § 4.16(a), if there is only one service-connected disability, the disability must be rated at 60 percent or more to qualify for schedular TDIU. If there are two or more service connected disabilities, there must be at least one disability ratable at 40 percent or more and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. § 4.16(a).

The Veteran is in receipt of service connection for residuals of appendectomy (adhesions, IBS, GERD, etc.) rated 60 percent disabling, for PTSD rated 30 percent during the period under consideration, loss of bladder control rated 20 percent disabling during the period under consideration, scars rated 10 percent disabling, and tinnitus rated 10 disabling. These service-connected disabilities combine to a disability rating greater than 70 percent throughout the appeal period (70 percent prior to November 27, 2009, and 80 percent until April 23, 2012), so he meets the criteria for consideration of TDIU on a schedular basis during the entire period on appeal.

In determining unemployability for VA purposes, consideration may be given to the Veteran's level of education, special training, and previous work experience, but not to age or any impairment caused by nonservice-connected disabilities. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.19 (2015). In reaching such a determination, the central inquiry is "whether the veteran's service-connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). The sole fact that a Veteran is unemployed or has difficulty obtaining employment is not enough. The question is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether he or she can find employment. Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993) (citing 38 C.F.R. §§ 4.1, 4.15, 4.16(a)). Disability ratings are based on the average impairment in earning capacity resulting from the disability. 38 U.S.C.A. § 1155; see also 38 C.F.R. § 4.1.

The Veteran has not been employed since he left his most recent employment due to nonservice-connected medical conditions. See, e.g., December 2013 VA Form 21-8940; July 2003 SSA Disability Determination and Transmittal (finding the Veteran disabled for SSA purposes as a result of arterial venous malformation in his brain and disorders of the back). The record reflects that the Veteran completed high school, but otherwise has no formal education or training. See December 2013 VA Form 21-8940 (Application for TDIU). The Veteran was most recently employed as a receiving clerk and his work history otherwise consists primarily of physical labor.

The Board starts with the recognition that his combined disability ratings of 70 percent prior to November 27, 2009, and 80 percent until April 23, 2012, indicate a significant impairment in the Veteran's earning capacity. See 38 C.F.R. § 4.1 (disability ratings represent "as far as can practicably be determined the average impairment in earning capacity resulting from" a veteran's service-connected disabilities). However, the relevant inquiry for purposes of determining entitlement to TDIU is whether the Veteran is unable to secure or follow a substantially gainful occupation as a result of his service-connected disabilities. The Board finds the evidence is against any such finding.

The Board, in the duty to notify and assist section above, has already discussed its reasons for rejecting the Veteran's contention that it is necessary to obtain an opinion specifically addressing the combined effect of all of his disabilities on his employability. The Board also notes that further delay in consideration of the merits of the TDIU claim is not necessary as a result of the remand of the Veteran's claim of entitlement to service connection for erectile dysfunction. Even assuming service connection is ultimately awarded for that condition, the record contains medical evidence establishing that his erectile dysfunction has no effect on his employability. See June 2011 VA Examination ("General Occupational Effect: No Significant Effect"). Therefore, the Board will proceed to consideration of the merits of the claim.

The Board has reviewed the SSA records which document the Veteran's unemployability, but identify only the Veteran's nonservice-connected disabilities as causing the disability for SSA purposes. See July 2003 SSA Disability Determination and Transmittal (finding the Veteran disabled for SSA purposes as a result of arterial venous malformation in his brain and disorders of the back). 

The SSA records predate the period on appeal, but have some, slight probative value in setting the baseline level of functioning in 2003. An April 2003 neuropsychological evaluation reviews the Veteran's overall functioning, particularly with respect to his cognitive functioning, and contains the conclusion: "Given the changes in his medical and cognitive status, [the Veteran] will likely not be able to work at his previous level. He currently experiences difficulties such as daily fatigue, limb weakness, headaches, decreased stress tolerance and fluctuations in concentration that will make it hard for him to persist in most regular employment situations." Notably, the only symptoms identified as interfering with his occupational functioning that are due, at least in part, to his service-connected conditions are the decreased stress tolerance and fluctuations in concentration, though those symptoms are also partially related to his AVM. The psychologist determined that the Veteran had "mild to moderate depressive symptomatology" along with "feelings of discouragement, failure, guilt, irritability, fatigue, and self-criticalness" as well as "trouble making decisions and concentrating."

The record contains reports on several VA examinations which addressed the impact of the Veteran's service-connected disabilities on his occupational functioning (employability).

At the March 2003 VA examination, the Veteran denied abdominal pains and was found to have "occasional right groin pains most likely related to intraabdominal adhesions." The examiner also noted scars (two with slight tenderness and numbness, one with mild tenderness and numbness) with an assessment of: "Continuing mild numbness and mild tenderness [due to] slightly bothersome scarring." The examiner opined that "[t]he abdomen will probably continue to have some discomfort" and flare-ups would limit back extension "by 10 degrees" (disregarding the effects of nonservice-connected back conditions).

VA examinations in May 2005 produced more detailed opinions with respect to occupational effects of the Veteran's service-connected conditions. With respect to PTSD (not yet service-connected), the examiner assigned a GAF of 60 and noted some mild memory, concentration, and cognitive impairments. The examiner found that one of the Veteran's scars caused "no symptoms whatever", while the other caused pains that radiate into the right scrotum with increases in intraabdominal pressure. The Veteran did not mention IBS or GERD and the examiner found no incisional or inguinal hernias. The Veteran did have bladder urgency, but actual incontinence was "very rare."

An October 2010 VA audiological examination indicated, with respect to effects on occupational functioning and daily activities, that his audiological disabilities resulted in "difficulties with women's voices and in background noise." While the examiner did not distinguish the effects of his nonservice-connected hearing loss from his service-connected tinnitus, the combined effect was still minimal, particularly with respect to the sorts of occupations (manual laborer, shipping clerk) for which the Veteran is suited by education, training, and experience.

In December 2010, the Veteran underwent a VA examination to evaluate his PTSD with depression. The examiner assigned a GAF of 60-70 and noted the Veteran's complaints of some problems with irritability, concentration, and memory. The examiner noted that the Veteran's irritability was possibly related to his nonservice-connected arteriovenous malformation (AVM) and that his memory and concentration were "grossly intact for purposes of this exam." The Veteran told the examiner that he wanted "to be 100% service connected" and that he was forced out of his most recent employment after objecting to an overwhelming amount of work without assistance. The examiner noted that, prior to his medical retirement, the Veteran had been able to obtain and maintain gainful employment for all of his adult years. The examiner also documented the Veteran's reports of a successful marriage of 18 years and outings with friends and family.

A June 2011 VA examination addressed the impact of the Veteran's service-connected medical conditions on his occupational functioning. With respect to the diagnosed GERD, abdominal pain (adhesions), and scars, the examiner opined that the conditions had "no significant effects" on the Veteran's usual occupation and no effects on his usual daily activities. He discussed the Veteran's loss of bladder control, noting urgency, hesitancy/difficulty starting a stream, dribbling, and frequency, but no leakage.

The Board will not discuss post-April 2012 VA examinations in detail, but will note that they do not contain any opinions regarding the level of occupational impairment due to service-connected conditions prior to April 23, 2012. Rather, they discuss impairments at the time of the examinations. While they provide some support for the award of TDIU after April 23, 2012, they have very little probative weight on the issue of occupational impairments prior to that date.

In April 2012, a private clinical psychologist examined the Veteran, assigned a GAF of "47-57", and opined that the Veteran's service-connected disabilities caused "social and occupational impairments across a wide area of context such as work, family relations, judgment, thinking and mood." The psychologist did not provide an opinion regarding the onset of the identified functional impairments and noted significant cognitive and physical impairments related to nonservice-connected medical conditions.

A July 2012 opinion letter by a VA nurse practitioner (the Veteran's primary care provider) discusses the severity of the Veteran's service-connected disabilities (including scars) and their impact on the Veteran's functioning, including occupational functioning, although she did not directly address the employability question posed by the Veteran's attorney. The nurse practitioner noted an "inability to be actively employed due to a multitude of issues" including both service-connected and nonservice-connected disabilities. She notes the significant effects of the nonservice-connected conditions and the difficulty of distinguishing between the symptoms due to service-connected disabilities versus those due to nonservice-connected disabilities. With respect to the scars on appeal, the nurse practitioner confirmed that the Veteran has three scars with pain when stretching the abdominal wall and diffuse tenderness of the abdomen. The abdominal pain was attributed to internal adhesions from the in-service surgery. She also stated that the service-connected PTSD more likely than not caused mood disturbances, irritability, and nightmares. She noted he was able to maintain his employment for many years while experiencing some of these symptoms and that the immediate cause of his ending his employment in 2003 was a nonservice-connected condition. She also discussed his urinary urgency and loss of bladder control. Overall, the letter indicates less impairment due to service-connected conditions than the private psychologist's report on the April 2012 mental health assessment.

The record also contains VA treatment records. To the extent they address occupational impairments and symptomatology, those records are largely consistent with the VA examinations. Often, however, when the treatment records contain a statement regarding occupational and functional impairments, particularly with regard to mental health, the treating provider does not distinguish the very serious symptoms and impairments attributable to the nonservice-connected AVM (and residuals thereof) from the symptoms associated with his service-connected PTSD with major depression. 

For instance, a July 2009 VA mental health note diagnoses major depression and cognitive disorder not otherwise specified, assigns a GAF of 52, and relates his mental health symptoms to his AVM and post-service traumatic brain injury. A September 2009 VA mental health note by the same psychiatric nurse indicates a GAF of 50 and "cognitive problems" that prevent the Veteran from working. The diagnoses include PTSD, major depression, and cognitive disorder not otherwise specified (which is associated with the AVM).

The VA treatment records also document the Veteran's continued complaints of gastrointestinal symptoms and abdominal pain which his providers attribute to the service-connected adhesions. See, e.g., November 2010 VA Nursing Note ("Pain is probably a result of scarring and/or adhesions from long ago past prior peritonitis."); September 2010 VA Nurse Practitioner Note (indicating probable IBS and opining that adhesions "are a factor in the stool, pain experiences"). However, the Board finds that these records provide little probative weight in favor of finding that the Veteran is unable to obtain or maintain gainful employment due to these service-connected conditions (including the combined effect of all of the service-connected conditions).

After reviewing all of the available medical evidence, the Board finds that the Veteran's service-connected disabilities, including their combined effects (e.g. pain exacerbating mental health symptoms), did not render him unable to obtain or maintain gainful employment prior to April 23, 2012. Rather, the medical evidence indicates that, while his physical disabilities caused some minor impairments (e.g. no heavy lifting), in occupational functioning, they otherwise had little effect on his occupational functioning during the period under consideration. Although his service-connected PTSD with major depression had more serious effects (e.g. irritability, decreased ability to get along with co-workers, impaired memory, impaired concentration), the mental health evidence does not indicate that the Veteran's impairments were sufficiently severe to prevent him from obtaining or maintaining employment.

In making these findings, the Board notes that the Veteran had most of these conditions while he was still employed and, although the medical evidence does indicate some worsening since 2003, it does not indicate so much worsening that his service-connected disabilities would prevent him from performing the tasks for which he was responsible during his last employment. Van Hoose, 4 Vet. App. at 363. It is also relevant that the Veteran was not service-connected for PTSD with major depression until November 2009. The examinations during the relevant time period for the express purpose of evaluating the Veteran's PTSD indicated mild to moderate, but not severe or total, impairment of occupational functioning. These assessments are reflected in and consistent with the GAF scores of 60 and above assigned by the examining mental health professionals. 

Despite some GAF scores below 60 in the medical records during this period, those GAF scores and the associated opinions regarding occupational impairments, reflect the combined effect of the service-connected PTSD with major depression and the nonservice-connected cognitive disorder (due to AVM and residuals thereof). The Board places greater weight on the more thoroughly explained opinions of the VA examiners which expressly address the service-connected mental health diagnoses. Owens, 7 Vet. App. at 433; Nieves-Rodriguez, 22 Vet. App. at 302-304.

The Board acknowledges that the combined effect of the service-connected disabilities would result in a greater impairment than the mild or moderate impairment caused by any one of them alone. However, the Board finds that their combined effect would result in moderate, perhaps moderately severe, occupational impairment, but not total unemployability. The Veteran retains the ability to perform basic manual labor, as long as the need for heavy lifting is minimal and, as in his last employment, the position allows frequent restroom breaks. His psychiatric symptoms had, at most, a moderate effect on his ability to perform the sort of tasks required by unskilled manual labor and light clerical duties, such as in his most recent position as a shipping and receiving clerk. These findings are supported by the medical opinions summarized above and also by the fact that the Veteran was able to perform his duties as a shipping and receiving clerk until nonservice-connected conditions forced his retirement, despite most of these conditions predating his retirement.

Although the Veteran has alleged that his service-connected disabilities render him unemployable, medical and mental health professionals have opined that the limitations are, at most, moderate. While the Veteran is competent to report the functional impact of his various disabilities, see Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009), he has not described the functional impact in a manner that allows comparison to the clinical judgments of the VA examiners and other health professionals whose opinions are of record. Moreover, the Veteran, as a layman, is poorly situated to differentiate the very serious impairments caused by his AVM, residuals thereof, and nonservice-connected physical disabilities (e.g. back) from his service-connected disabilities. The Board finds that the Veteran's conclusion, unsupported by reasoning that connects facts or data with his opinion, has very little probative value. Nieves-Rodriguez, 22 Vet. App. at 304. Moreover, to the extent that his opinion regarding the clinical significance of his symptoms conflicts with the opinions of the medical professionals, the Board finds the medical professional's opinion to be more objective, more thoroughly explained, and based on more reliable facts and data. Owens, 7 Vet. App. at 433; Nieves-Rodriguez, 22 Vet. App. at 302-304.

The Veteran's service-connected disabilities were relatively stable during the period under consideration, though there was gradual worsening, and had only a mild to moderate impact on his ability to perform the physical and mental acts required by employment in the occupations for which the Veteran's education, experience, and training suit him. Van Hoose v. Brown, 4 Vet. App. at 363. The medical opinions of record are all against the Veteran's claim of functional impacts sufficient to render him unemployable. The Veteran has not identified functional impacts overlooked by the examining physicians, so the Board is primarily faced with evaluating the medical opinions in the light of the legal criteria. For all the reasons set forth above, the Board finds the medical opinions regarding employability more persuasive than the Veteran's opinions or the opinions subsequent to the period on appeal. See, e.g., Owens, 7 Vet. App. at 433.

In making the above findings, the Board notes that the effective date of an award of service connection or an increased rating is the date the claim was received or the date entitlement arose, whichever is later. See, generally, 38 C.F.R. § 3.400; see also 38 C.F.R. § 3.400(o)(2) ("Earliest date as of which it is factually ascertainable that an increase in disability had occurred if claim is received within 1 year from such date otherwise, date of receipt of claim."). The examination on April 23, 2012, provided the first evidence placing the issue of unemployability at least in equipoise. The evidence prior to that date was against the Veteran's claim of entitlement to TDIU. Consequently, April 23, 2012, is the earliest date on which entitlement arose

The symptoms of the Veteran's service-connected disabilities alone were not of sufficient severity to produce unemployability as contemplated by the relevant regulations during any part of the period on appeal. The Veteran is not entitled to TDIU for any portion of the appeal period. The evidence is not in equipoise and, therefore, the Veteran is not entitled to the benefit of the doubt on this issue. Gilbert, 1 Vet. App. at 53-56.


ORDER

Entitlement to a disability rating greater than 10 percent for residual scars, status-post appendectomy, is denied.

Entitlement to TDIU for the period prior to April 23, 2012, is denied.


REMAND

The Board will remand the Veteran's claim of entitlement to service connection for erectile dysfunction as secondary to his service-connected disabilities because the medical evidence of record is insufficient to decide the claim on the merits and the most recent opinion is inadequate.

Importantly, in the context of claims for secondary service connection, the evidence must demonstrate an etiological relationship between the service-connected disability or disabilities on the one hand and the condition said to be proximately due to the service-connected disability or disabilities on the other. Buckley v. West, 12 Vet. App. 76, 84 (1998); see also Wallin v. West, 11 Vet. App. 509 (1998); Reiber v. Brown, 7 Vet. App. 513, 516-17 (1995). Secondary service connection may also be warranted for a nonservice-connected disability when that disability is aggravated by a service-connected disability. See Allen v. Brown, 7 Vet. App. 439 (1995) (en banc).

The evidence of record includes a number of statements regarding the likely etiology of the Veteran's diagnosed erectile dysfunction. A December 2003 VA progress note documents "sexual dysfunction" associated with medication for anxiety and depression. A March 2005 VA examination indicated that the condition was related to emotional factors such as depression. Notably, the Veteran was not service-connected for any psychiatric disorder until November 2009 and the July 2010 JMR specified that the March 2005 opinion was inadequate because it failed to include a sufficient rationale. 

A July 2008 VA nurse practitioner's note indicates "pain from left testicle that goes up into abdomen near his surgical scars." This at least indicates a possible association between ED and the Veteran's service-connected abdominal adhesions and scars.

As the Veteran's representative thoroughly and convincingly argues in his July 2015 Written Brief Presentation, the June 2011 VA examiner's opinion is inadequate for several reasons, including that it appears to be internally contradictory and fails to contain an adequate secondary service connection opinion (addressing both causation and aggravation). Specifically, she opined that "[i]t is difficult to outline cause of ED and could be due to age 64-not uncommon in this age group with perhaps 50% of men have difficulties at this time. It could possibly be related to surgery??" She later opined that the condition was less likely than not caused by or a result of the in-service surgery for a ruptured appendix and explained, after noting the Veteran's age, that ED occurs more frequently with age, and that he had no problem with ED "until around 2005 when there were some minor problems mentioned" in his medical records. She does not address the possible connection to service-connected PTSD (and/or treatment therefore) for the period beginning November 27, 2009, she does not address aggravation with respect to any service-connected conditions, and her possible linkage to "surgery" is ambiguous regarding which surgery as the Veteran has had surgery for both service-connected and nonservice-connected conditions during the relevant time frame.

Remand to obtain an adequate opinion is necessary. Barr v. Nicholson, 21 Vet. App. 303, 311 (2007); Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007) (an adequate medical opinion "must support its conclusion with an analysis that the Board can consider and weigh against contrary opinions"). 

Accordingly, the case is REMANDED for the following action:

1. Obtain a medical opinion regarding the etiology of the Veteran's diagnosed erectile dysfunction. The entire claims file (i.e. the paper claims file and any medical records contained in Virtual VA, CAPRI, and AMIE) should be reviewed by the examiner who examined the Veteran in June 2011 for the purpose of obtaining an addendum opinion (or another medical professional if that person is no longer available). A new examination is not required, unless it is deemed needed. 

After reviewing the record and performing any examination and/or testing of the Veteran deemed necessary, the examiner should address the following:

a. Is it at least as likely as not (probability of at least 50 percent) that the Veteran's diagnosed erectile dysfunction either began during or was otherwise caused by his military service, including the in-service appendectomy and residuals therefrom?

b. If the examiner provides a negative response to (a), is it at least as likely as not (probability of at least 50 percent) that the Veteran's diagnosed erectile dysfunction was caused by any of the Veteran's service-connected disabilities (or treatment therefore) including adhesions of peritoneum and abdominal pain, residual scars from the appendectomy, and/or PTSD with major depression?

c. If the examiner provides a negative response to (b), is it at least as likely as not (probability of at least 50 percent) that Veteran's diagnosed erectile dysfunction is aggravated by any of the Veteran's service-connected disabilities (or treatment therefore) including adhesions of peritoneum and abdominal pain, residual scars from the appendectomy, and/or PTSD with major depression?

Each of the requested opinions should address the relevance, if any, of post-service surgeries such as the post-service transurethral resection and subsequent surgery to repair resulting scar tissue that caused urinary obstruction.

Importantly, for the period prior to November 27, 2009, the examiner should not provide a positive response to (b) or (c), if the positive response would be based on PTSD with major depression, because that condition was not service-connected prior to that date. However, it would be helpful if the examiner discussed the relevance, if any, that the Veteran's PTSD with major depression has in the context of his ED during the entire period under consideration.

The examiner must provide a complete rationale for any opinion expressed that is based on the examiner's clinical experience, medical expertise, and established medical principles. If an opinion cannot be made without resort to speculation, the examiner must explain why this is so and note what, if any, additional evidence would permit an opinion to be made.

2. After completing the above, readjudicate the claim of entitlement to service connection for erectile dysfunction. If the claim remains denied, provide the Veteran and his representative with a supplemental statement of the case and allow an appropriate time for response.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



____________________________________________
MICHELLE L. KANE
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs